WATERBURY STATE BANK, APPELLEE, v. JOHN S. O'NEILL ET AL., APPELLANTS.

FILED MAY 17, 1935. No. 29250.

*P. F. Verzani* and *D. Van Donselaar*, for appellants.

*Kingsbury, Kingsbury & Kingsbury*, contra.

Heard before GOSS, C. J., ROSE, GOOD, DAY and CARTER, JJ., and LOVEL S. HASTINGS and LIGHTNER, District Judges.

LIGHTNER, District Judge.

Creditors' bill by plaintiff bank to set aside a deed and two mortgages. The judgment of the district court was for plaintiff and all defendants have appealed. On September 15, 1931, John S. O'Neill gave his note of $2,645 to the bank which represented the amount he then owed it, which indebtedness had been in existence for a number of years. This note was payable on demand, and on January 30, 1933, the plaintiff secured a $3,003.50 judgment there-

on, upon which execution was issued and returned *nulla bona* prior to bringing this suit.

The deed which the bank seeks to set aside is one given by the defendant John S. O'Neill, to his wife, Mary Ellen O'Neill, on the 28th day of January, 1932. The mortgages are a mortgage of $1,500 given to the defendant Verzani on May 25, 1932, by the O'Neills and assigned to and now owned by defendant Van Donselaar, and a mortgage of $400 given by them to defendant Verzani on the 28th day of May, 1932. The O'Neills were married May 13, 1913, at which time Mr. O'Neill was the owner of the 160 acres of real estate here in question, which had been given to him by his father, but subject to a $3,000 mortgage against it. The first mortgage at the time of trial of this suit amounted to $3,500.

The stated consideration for the deed from John S. O'Neill to his wife is $500 and their claim now is that Mrs. O'Neill had about $350 when they were married and that she inherited $150 from her grandfather a number of years later, both of which sums were turned over to her husband, with the agreement that any time she wanted the money and he could not give it to her he would give her a deed to the land. She claims further that she did not know that her husband was indebted to the bank, although he first began to borrow from it in 1915, and that the transaction by which she got the land was *bona fides*. It appears from the evidence that Mr. O'Neill made a number of property statements to the bank in and about the time in question, in none of which he mentioned this alleged indebtedness, except that the last one made on September 15, 1931, the day he gave the note, referred to "incidental debts" of $500; that his wife knew considerable about his business affairs; that she checked on his account at the bank, had access to his safety box, made out some of his reports while he was administrator of his father's estate, frequently visited the bank, and in the winter of 1931-1932, while her husband was sick, advised it that he was not able to come at the particular time they had requested him to come in, but would do so later. She states

that she earned the $350 during three years teaching, but does not state the wages she received, nor how she was able to save that amount during the three years. She refers to banks in which the money was kept, but does not produce any records to show that she ever had accounts in the banks referred to. No change in the apparent possession or management of the farm was made after the purported deed. Some questions that were asked of her were not answered and in some cases her answers were evasive or at least hesitant and apparently for the purpose of enabling her to decide what her final answer would be, as witness the following: "Q. Where did you have that money? A. I had it. Q. Whereabouts did you have it? A. I had it with me. Q. Did you have it at home? A. (No answer.) Q. Where did you keep it? A. Well, I kept part of it, maybe a part of it at the Waterbury State Bank and part in the Jackson State Bank. Q. That is the money you let John have? A. $350 of it. Q. Did you give him a check on the Waterbury State Bank? A. No; I didn't, not a check. I came and drew it out when I was married; I think I drew it before I got married, I mean. I am not just sure what time of the year I did draw it, but I had it when I was married."

The burden to establish the *bona fides* of this deed was upon the grantee. The district court held that she did not sustain this burden, and a careful analysis of the evidence convinces us that the district court was right. In *Flint v. Chaloupka,* 78 Neb. 594, it is said: "The indebtedness claimed by the wife represented alleged advancements to her by her father * * * and an inheritance from her father. * * * We cannot say, as a matter of law, that the relationship of debtor and creditor existed between husband and wife when the note was executed and delivered to her. * * * The defense may be true, but it is not shown by clear and satisfactory evidence. * * * If the record contained any written evidence, or testimony of disinterested witnesses corroborating the testimony of the Chaloupkas, we would not hesitate in affirming the judgment. As it is, the *bona fides* of the transaction remains in doubt,

and we are required to resolve that doubt against the parties upon whom the law has placed the burden of proof." And in another place in the same case it is said: "It is a well-established rule that, where a transfer of land is made by a debtor to a near relative in consideration of a past-due indebtedness, the burden rests upon the grantee in a creditor's suit to show that the debt was genuine, that his purpose was honest, and that he acted in good faith in obtaining title. Such transactions are looked upon with suspicion, and the suspicion continues until the grantee shows the good faith of the transfer by clear and satisfactory evidence. Generally, when the transaction is in fraud of creditors, knowledge thereof rests only with the near relatives, or others in privity with the debtor. When the testimony relied upon to show good faith is given by interested relatives only, the reasonableness or unreasonableness of their evidence has considerable weight in arriving at a just conclusion." See, also, *Meighen v. Chandler*, 20 N. Dak. 238, and *Eggleston v. Slusher*, 50 Neb. 83.

If Mrs. O'Neill had a claim against her husband, she did not assert it, but permitted him to obtain credit from the bank because of his apparent ownership of the land. The district court had the advantage of observing the witnesses; even the typewritten record shows a failure on Mrs. O'Neill's part to answer questions that were propounded to her. Many things were left unexplained that should have been explained. Mrs. O'Neill failed to sustain the burden of proof which the law imposes upon her.

In appellant's brief the further claim is made that an additional consideration was the payment by Mrs. O'Neill of certain debts of her husband. A sufficient answer to this contention is that these alleged payments apparently were not in the minds of the parties when the deed was given to her. The consideration mentioned in the deed is $500 only. Furthermore, there is the possibility that the district court found that these alleged payments of $245 to Leonard O'Neill, Mr. O'Neill's brother, and $1,105 to George W. Teller, Mrs. O'Neill's father, were fictitious. At least Mr. O'Neill never revealed any such indebtedness

in any of his property statements, and neither Leonard O'Neill nor George W. Teller testified, nor is there anything in the record to justify the court in finding that there was any actual indebtedness or any actual payment of these two amounts. It is true that the record shows that these persons went into the bank with Mr. and Mrs. O'Neill, and that they added their names to the indorsement, but it does not clearly show that they got the money, or, if they did get it in the bank, that they continued to retain it.

There does not seem to have been any valid consideration for the $400 mortgage to Mr. Verzani, and the district court was fully justified in setting it aside. It is claimed that part of this was for Mr. Verzani's fees in acting as an attorney for Mr. O'Neill in settling his father's estate. Mr. Verzani did not testify and it does not appear from the record why Mr. O'Neill personally assumed this indebtedness for which his father's estate was liable. The other alleged consideration was commissions for obtaining the $1,500 loan from Mr. Van Donselaar, but again the record is void of any evidence as to what a reasonable consideration for such service would be. Other services are referred to, but there is not even a hint what they were except a reference to this suit which had not then been filed.

The district court also set aside the $1,500 mortgage now owned by Mr. Van Donselaar and for which he claims he paid $1,500. It appears from the record that the O'Neills applied to the bank for a $1,500 loan and were unable to obtain it; that they then went to their attorney, Mr. Verzani, and asked him to procure that amount for them; that he took the matter up with Mr. Van Donselaar, and that Mr. Van Donselaar inspected the land, ascertained the amount of encumbrances against it and decided to make the loan if Mr. O'Neill would also give a chattel mortgage on the personal property then on the farm; that thereupon Mrs. O'Neill and her husband executed the $1,500 mortgage on May 25, 1932, to Mr. Verzani, and Mr. O'Neill on the same day executed to Mr. Verzani a $1,500 chattel

mortgage covering live stock on the farm and growing crops; that the parties then met in Sioux City, Iowa, on the 27th day of May, 1932, at which time Mr. Van Donselaar received an assignment of the $1,500 mortgage on the real estate to Mr. Verzani and gave therefor to Mr. and Mrs. O'Neill three checks, one for $150 upon which the O'Neills got the money, a $245 check upon which it is claimed Leonard O'Neill got the money, and $1,105 check upon which it is claimed George W. Teller, Mrs. O'Neill's father, got the money. It is further claimed that Mr. O'Neill owed his brother Leonard and his father-in-law these sums. The only suspicious circumstances connected with this transaction are the fact that Mr. Verzani, who apparently knew about the affairs of the O'Neills, was acting also for Mr. Van Donselaar, and the further fact that two of these checks were made to cover indebtedness which might have been fictitious; that is, the $245 and $1,105 checks above referred to. The district court might have come to the conclusion that, while these checks were made out and probably cashed, Mr. Van Donselaar actually did not part with any money permanently. It does not seem likely to us that Mr. Van Donselaar, a comparative stranger to the O'Neills, would enter into such an elaborate scheme to defraud the plaintiff bank. No motive is shown. The burden of establishing that this was a fraudulent conveyance was on the plaintiff. At most it seems to us the evidence justifies a suspicion that Mr. Van Donselaar was acting with the others in a scheme to defraud. It appears just as likely that he made the loan in good faith and that in making the loan he relied upon the then condition of the title which was in Mrs. O'Neill. Appellees refer to an Iowa case (*Brittain Dry Goods Co. v. Plowman,* 113 Ia. 624) where a mortgage given for a present loan was held void as to creditors. An examination of the facts in that case show a purported loan from one brother to another, but there were many suspicious circumstances, and the court in that case say: "It is at least doubtful whether the last money hired was ever paid to the mortgagor, but, regardless of whether this was done, the circumstances were

such as to put appellant, as an ordinarily prudent man, on inquiry concerning the purpose of G. W. Plowman in executing the mortgage." Then follows in the opinion a statement of the various suspicious circumstances which would put the mortgagee on inquiry, none of which, in so far as we can see, exist in this case. Here it appears that Mr. Verzani went to Mr. Van Donselaar and solicited a $1,500 loan for the O'Neills. He would have no occasion to tell Mr. Van Donselaar the trouble the O'Neills had had with the bank; in fact, he would be more likely to get the loan if he told Mr. Van Donselaar nothing about such matters. Mr. Van Donselaar then looked at the farm and concluded to make the loan. He knew from some source that the title was in Mrs. O'Neill, and there were no suits pending against either Mr. or Mrs. O'Neill; the bank at that time not having reduced its indebtedness to judgment or begun to do so. Mr. Van Donselaar then advised Mr. Verzani that he would make the loan, and Mr. Verzani procured the mortgage and assigned it to Mr. Van Donselaar in exchange for the $1,500. The law presumes that all men act honestly. It does not appear that Mr. Van Donselaar was connected with any fraud and the decree setting aside his mortgage will have to be reversed.

There was a sharp difference of opinion as to the value of the land, plaintiff's witnesses placing it at from $75 to $100 an acre, and defendants' at from $30 to $35 an acre. The weight of evidence justifies a finding that there may be an equity above the first mortgage, Mr. Van Donselaar's second mortgage and the homestead interest.

Appellants insist that a cause of action is not stated because plaintiff did not allege that the bank's judgment was docketed and indexed in the county where the land lies. The case cited by them (*Thies v. Thies,* 104 Neb. 248, *id.* 111 Neb. 805) was where a judgment was obtained in Douglas county and the creditors' bill was brought in Keith county. Here it is established that the judgment was rendered in Dixon county, execution was issued thereon in Dixon county and returned unsatisfied, and the land lies in Dixon county. This is a sufficient foundation for the

creditors' bill. See, also, *State Bank of Ceresco v. Belk,* 68 Neb. 517. The rule laid down in *Metz v. State Bank of Brownville,* 7 Neb. 165, and *German Nat. Bank of Beatrice v. Atherton,* 64 Neb. 610, is for the protection of innocent purchasers and has no applicability here.

Defendants also claim that there was a misjoinder of defendants and causes of action, but the general rule is: "All parties interested in the controversy, or who may be affected by the judgment or decree rendered therein, should be made parties." 27 C. J. 750.

Affirmed as to deed and Verzani mortgage, reversed as to Van Donselaar mortgage.

AFFIRMED IN PART, AND REVERSED IN PART.